EW
F. #2012V00484

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

CARMINE GRAZIANO,

        Petitioner,

  - against -              12-CV-738 (JFB)

UNITED STATES OF AMERICA,

        Respondent.

- - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255


                                LORETTA E. LYNCH
                                United States Attorney
                                Eastern District of New York
                                610 Federal Plaza
                                Central Islip, New York  11722


Evan C. Williams
United States Department of Justice Trial Attorney
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this Memorandum of Law in opposition to pro se petitioner Carmine Graziano's ("Graziano") motion pursuant to Title 28, United States Code, Section 2255, to vacate, set aside or correct the judgment this Court imposed upon him on July 1, 2009, convicting him, after a jury trial, of one count of conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(n), and one count of arson, in violation of Title 18, United States Code, Section 844(i). The Court sentenced Graziano to concurrent terms of incarceration of 180 months, which he is serving, five years of supervised release, $216,924.82 in restitution and a $200 special assessment.

In the alternative, Graziano requests that the Court hold an evidentiary hearing pursuant to 28 U.S.C. § 2855(b) to determine the issues raised by his motion and make findings of fact and conclusions of law.[1]

Graziano makes four claims of ineffective assistance of counsel. First, he claims that he was convicted improperly of arson, Count Two of the indictment, on an acting in concert theory, because trial counsel failed either: (i) to challenge the facial sufficiency of the indictment on grounds that it did not

---

[1]   Graziano also notes that the Court may appoint counsel for proceedings relating to his motion, see 28 U.S.C. § 2255(g), but does not actually request counsel nor set out any grounds for such appointment.

adequately plead aiding and abetting; or (ii) to challenge as a constructive amendment of the indictment the Court's instruction to the jury that it could convict Graziano of aiding and abetting arson.

Second, Graziano faults trial counsel's failure to file a motion for a new trial pursuant to Fed. R. Crim. P. 33, following the government's disclosure of a recorded telephone conversation in which trial witness Frank Morrow claimed that he had perjured himself during Graziano's trial.

Third, Graziano cites appellate counsel's failure to raise on appeal the Court's summary denial of Graziano's motion for a judgment of acquittal on the first two counts of the indictment, arson conspiracy and arson, after the close of the government's case in chief, pursuant to Fed. R. Crim. P. 29(a).

Finally, in what Graziano labels a "Supplemental Argument," not included in the main body of his memorandum of law, he argues that trial counsel should have called a computer forensics expert to contest the government's evidence that a security camera mounted outside the arson victim's business retained only approximately forty-eight hours of footage preceding the fire. The inference of Graziano's argument, though he does not actually state this, is that trial counsel was ineffective for failing to do so.

For the reasons set forth below, the Court should deny Graziano's motion without a hearing.

<u>STATEMENT OF FACTS</u>

I.   <u>Overview</u>

        Graziano was the owner of a bar in New Hyde Park, New York that was located next door to a building owned by Joseph and Anna Graham.  The building housed the Grahams' greeting card store on the ground floor and two residential apartments on the second floor.

        Graziano's conviction in this case arose from his hiring of a man to commit an arson at the Grahams' store in August 2003.  The arson culminated a long-running dispute between Graziano and the Grahams.  The fire resulted in the permanent closing of the Grahams' store and in injuries to Dominic Vassino, a partially-paralyzed man who resided in one of the second-floor apartments.

II.   <u>The Superseding Indictment</u>

        On February 14, 2008, the grand jury returned a three-count superseding indictment against Graziano.  (P 61).[2]  Count One charged him with conspiracy to damage and destroy the

_____

[2]      "Br." refers to Graziano's § 2255 brief.  "GX" refers to government exhibits received into evidence at trial.  "T" refers to the trial transcript.  "ST" refers to the sentencing transcript. "PSR" refers to the Presentence Report prepared by the United States Probation Department.  "P" refers to docket entries for the underlying case, <u>United States v. Carmine Graziano</u>, 07-CR-508(S-1)(JFB), in the Public Access to Court Electronic Records ("PACER") database.  "PA" refers to page numbers in the General Docket in PACER for the underlying appeal, <u>United States v. Carmine Graziano</u>, 09-3062-cr, and "App." refers to Graziano's brief in that appeal.

Grahams' store by fire, and in doing so causing personal injury
to another person (Vassino), between July 1 and August 11, 2003,
in violation of 18 U.S.C. § 844(n).  Count Two charged him,
together with others,[3] with the substantive crime of arson
causing personal injury to another person, on August 11, 2003, in
violation of 18 U.S.C. §§ 2 and 844(i).  Count Three charged him,
together with others, with the use of a destructive device in
connection with the arson charged in Counts One and Two, in
violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii) and 2.[4]

III.  The Evidence At Trial

        In 1983, Joseph and Anna Graham, a married couple,
purchased a building at 245 Jericho Pike in New Hyde Park, New
York and opened a greeting card store.  They named the store
Roseanne's Cards Galore ("Roseanne's") after their daughter.  (T
131-32).  The Grahams operated the store themselves, with no
additional employees.  They were open seven days a week.  (T 132-
33).  The building housing the store also had two second-floor
apartments that were continuously occupied from 1983 through

---

[3]     In addition to including the words "together with others,"
Count Two also included a citation to Title 18, United States
Code, Section Two, which holds liable as a principal one who
"aids" or "abets" the commission of a crime.  Id.  That citation,
along with the citation to arson itself, 18 U.S.C. § 844(i),
appeared in a parenthetical following the charging language.

[4]     Although Graziano was convicted at trial of all three
counts, the Court ultimately dismissed Count Three pursuant to
Fed. R. Crim. P. 29(c).  See United States v. Graziano, 616 F.
Supp. 2d 350 (E.D.N.Y. 2008).

2003, one of them by Dominic Vassino, who was paralyzed on one side of his body.  (T 134-35, 168).

In 1999, Graziano and his partner Richard Edgar purchased the business next door to the Grahams' store, at 247 Jericho Turnpike, which for the prior 16 years had been a bar called Bojangle's.  They opened a bar called J. P. McCauley's. Its name was later changed to Copperfield's Pub ("Copperfield's"), and Edgar dropped out as an owner.  (T 136-38).

In the fall of 1999, Graziano began holding "College Nights" at Copperfield's, which attracted large crowds of noisy patrons.  Neighbors told the Grahams that these patrons included underaged drinkers.  (T 140, 284).  After midnight on one of these "College Nights," the Grahams received a call from Vassino and came down to their store to investigate.  Vassino had difficulty speaking and needed the Grahams to call 911 for him. Joseph Graham saw what he believed was drug paraphernalia strewn in front of Copperfield's.  He called 911, and the police responded.  (T 140-41, 283).  When Joseph Graham came back to Roseanne's at 6:00 a.m. to open his store, a Copperfield's patron came outside, got onto  a motorcycle and started driving back and forth on the sidewalk, finally flinging his helmet at the front window of Roseanne's.  Joseph Graham again called 911, and the police responded again.  They made no arrests, however.  (T 142).

Later that morning, he walked into Copperfield's, told

-4-

Graziano what had happened and asked if Graziano could lower the volume of the music in the future.  Graziano responded, "[Y]ou know, I'm protected, connected, and you don't know who I have to answer to."  (T 143).

Later the same day, Anna Graham was working alone in Roseanne's when Graziano walked into the store and brandished a gun, pointing it at her dog, Rocky, and then at her.  She did not say anything to a customer who walked in afterward with her little boy, not wanting to frighten them, but immediately afterward called the Nassau County Police Department ("NCPD"), where she spoke with an inspector.  Two weeks later, she went down to the police station to follow up, was not able to see the inspector, and after waiting two hours to speak with a detective, left.  She did not find it unusual that the police did not provide her with a copy of their report because she went on to file additional complaints and was never provided with a copy of the police reports, even when she specifically requested them. She was surprised when she learned that the police had never filed an incident report based on her complaint to the inspector about Graziano's threat with the gun.  (T 283-86).  The police made no arrests.  Anna Graham later recounted the incident in a complaint in support of a civil suit against Graziano.  (T 288).

On March 17, 2000, the police notified Joseph Graham that the front window of Roseanne's was broken and that they believed a Copperfield's patron was responsible.  The Grahams

-5-

tracked down the patron, who had accidentally left his beeper behind, and convinced him to report what had happened to the police.  Joseph Graham also complained to Edgar (who was still co-owner of Copperfield's at the time), who denied any responsibility.  The police made no arrests.  (T 147).

On April 10, 2000, Anna Graham, after parking her car near Roseanne's and around the corner from Copperfield's, passed Graziano, who seemed angry when he saw her and muttered as he walked past the passenger side of her car.  A little later, she returned to the car and saw Graziano, walking away from it, throw down a bottle.  She found a dent in the passenger door.  She reported the incident to the police.  (T 289-90).

Later that day, Graziano approached Anna Graham, again brandishing a gun, and told her to stop complaining about Copperfield's or to "kiss [her] husband's ass goodbye."  (T 291). She also told the police about this incident.  She never saw a police report.  And the police made no arrests in connection with either incident on April 20.  (T 292-93).  In October 2000, she filed a complaint with the Nassau County District Attorney's Office ("NCDA") about the gun incident.  (T 336-38).

On October 24, 2000, Joseph Graham arrived at Roseanne's to find that all of his phone lines had been torn out at the rear of his business.  He reported this to the police, blaming Graziano.  The police made no arrests.  (T 148-49).

Later that day, Graziano approached Anna Graham while

-6-

she was alone and told her that she was hurting his business and that he was going to hurt hers if she did not stop complaining. She reported this to the police, but no arrests were made.  (T 293).

Because of these incidents, the Grahams, in the fall of 2000, installed video surveillance cameras.  They also installed an automatic door lock and buzzer system, leaving their door locked even during business hours and buzzing it open for customers.  Graziano's reaction to the video system was to make obscene gestures to the camera and to install a spotlight designed to ruin the picture.  Joseph Graham in turn installed a mirror to redirect the spotlight toward Copperfield's.  (T 149-52).

In the fall of 2001, Graziano began complaining about Joseph Graham to Patrick Toland, a convicted robber[5] who worked for Graziano at another business of his, a Wise Potato Chips delivery route.  (T 372-73).  Graziano asked whether Toland could have someone beat up Joseph Graham.  Toland spoke to a warehouse co-worker, Javier Reyes, and asked whether Reyes's brothers could

---

[5]   Toland would be convicted of three additional felonies by the time he testified at trial; he would also enter into and then breach a cooperation agreement with the NCDA.  Toland was still cooperating when he met in 2006 with federal agents investigating the Roseanne's fire and first told them about Graziano's attempt to have Joseph Graham assaulted.  Toland testified at trial under subpoena, but had no cooperation agreement with either state or federal authorities; in fact, he was due to begin a state prison sentence the week following his testimony.  (T 363-68, 406-08).

do the job.  Toland met with one of Reyes's brothers, Dorian, and another man.  Toland later drove Dorian and the other man past Roseanne's but did not know whether an attack ever occurred. (T 375-79).  Separately, Graziano spoke with Reyes also, who had approached him looking for additional work.  Graziano asked whether Reyes could "scare" someone on Jamaica Avenue.[6]  Reyes spoke with Toland and gave his phone number to Dorian so they could "hook up."[7]  (T 423-24).

During the 2000 to 2001 period, Graziano and the Grahams also engaged in civil litigation.  First, Graziano sued the Grahams.  (T 255).  In 2000, the Grahams responded by filing suit against Graziano, who filed a counterclaim in 2001.  By 2002, both parties suspended their actions; for the Grahams because of the financial burden.  (T 153-55, 254).

Anna Graham, frustrated by what she perceived as the police department's inaction, also began filing complaints with other public agencies, including the NCDA and local and state legislators.  (T 294-95).  The NCDA set up a mediation session with Graziano, but Anna Graham walked out of the session.  (T

---

[6]    Jamaica Avenue is a street in Queens, New York, that extends into Nassau County, where it becomes the Jericho Pike.

[7]    The government did not attempt to resolve further the apparent conflict between Graziano's requests of Toland and Reyes, which defense counsel explored in cross-examination, as he did Reyes's felony drug conviction, bouts with mental illness, drug use and the fact that he was on parole when he first told federal agents about Graziano's request.  (T 426-30).

296).

Anna Graham also assisted Vassino in filing at least
seven noise complaints (GX 51-A to 51-G) with the Village of New
Hyde Park.  Because Vassino had difficulty writing, Anna Graham
would write them out and have Vassino sign them.  (T 311-12).
The village dismissed the complaints.  (T 318).

Anna Graham began a petition to the Village of New Hyde
Park complaining about Copperfield's.  She collected signatures
in Roseanne's from neighborhood residents.  (T 296-97, GX 33).

On February 12, 2002, Joseph and Anna Graham brought
many of the petition's signers, including Vassino, to a hearing
of the New Hyde Park Board of Trustees on Copperfield's
application for a renewal of its cabaret license.  (T 297).
Because of Vassino's speech problems, Anna Graham arranged to
have him meet privately with one of the board members before the
hearing.  (T 297-98).  At the hearing, a sound expert for
Copperfield's acknowledged that the bar operated a discotheque
where high-volume music, of up to 100 decibels, was played.  (T
259-60).  On May 8, 2002, the village denied Copperfield's
application.  (T 258, GX 35).

On April 18, 2002, the Grahams attended a hearing of
the New York State Liquor Authority ("SLA") on alleged violations
by Copperfield's.  Graziano was also present.  Anna Graham
testified on Vassino's behalf, presenting a catalog of
disturbances at Copperfield's and displaying footage from

-9-

Roseanne's video cameras to support her claims.  (T 298-99).  On July 2, 2002, the SLA imposed a $2500 civil penalty on Copperfield's.  (T 258, GX 34-B).

Joseph Graham later filed a separate complaint with the SLA against Copperfield's, claiming, among other things, that Graziano was permitting underaged drinking and was bringing in liquor from unlicensed sources.  He took photos of Graziano bringing the liquor into the bar and saw Graziano look at him. (T 155-56).  There was no evidence at trial about the disposition of this complaint.

In 2003, Anna Graham contacted the community organizing group ACORN on behalf of a Hispanic family that lived in an apartment above Copperfield's.  (T 302-03).  ACORN organized a small meeting for those tenants and other neighborhood residents at Roseanne's.  (T 262-63, 303).  On June 4, 2003, ACORN held a larger meeting about Copperfield's at a local church, attended by about 50 neighborhood residents, and also by, among others, NCPD Chief of Patrol Anthony Rosco, Nassau County Deputy County Executive Helena Williams, and Captain Richard Capece, Administrative Officer of the NCPD's Third Precinct.  (T 342-44). Anna and Joseph Graham spoke and played surveillance tapes of Copperfield's, and neighborhood residents also spoke.  At the meeting's conclusion, the police promised remedial action.  (T 158, 264-65, 304-05).

Capece was tasked by Rosco with following up and then

-10-

preparing a written report documenting the steps taken.  These included: "red-flagging" Copperfield's, which required a patrol supervisor to respond to any 911 call; initiating a "Project 21" to target underage drinking; conducting SLA checks; and "zero tolerance" of any code violations, such as illegal parking.  In addition, Capece was instructed by Rosco to provide copies of any SLA referrals to the Grahams, to whom he referred as the "principal complainants" because they had called the Third Precinct repeatedly and had caused the ACORN meeting.  Capece put out a bullet point memo (GX 26) in the Third Precinct to make all of his officers aware of the increased scrutiny on Copperfield's. Finally, Capece called Graziano to inform him of the zero tolerance policy.  Graziano was courteous and told the captain that he knew this was all because of the Grahams.  (T 345-48). The police went on to conduct premises checks of Copperfield's several times during the summer of 2003 but found no violations. (T 360).

In the summer of 2003, Graziano began talking about his problems with the Grahams to Frank Morrow, a 34-year-old convicted drug dealer, lifelong alcoholic and crack user, and veteran of numerous rehabilitation clinics, where he saw psychiatrists for diagnosed mental illnesses including bipolar disorder.[8]  (T 512-17, 527-28).  Morrow had been patronizing

---

[8]    Morrow had additional misdemeanor convictions, but the Court barred their admission under Fed. R. Evid. 609 as not involving

-11-

Copperfield's, and J. P. McCauley's and Bojangles before that, since 1988. Graziano had known Morrow since about 2001, solely from the bar, as a drug addict and occasional brawler. (T 522-25). Morrow was a regular in 2001 and the beginning of 2002, but after entering a rehabilitation clinic, only an occasional visitor through most of 2002 and the first seven months of 2003. (T 526-27).

Morrow, who was from the area, knew the Grahams and Roseanne's. He had not spoken with them since approximately 1998, when, after a drinking binge at Bojangle's, he kicked in the front window of Roseanne's to frighten off his brother, who was trying to take him home. He never apologized or even admitted this to the Grahams. He was never arrested or charged, and neither the Grahams nor anyone else ever contacted him to demand payment for the window. He held no animus toward the Grahams. (T 528-30).

Graziano complained to Morrow at Copperfield's on three or four occasions about problems caused by the Grahams, primarily the increased police presence, which he said was hurting his business. (T 530-31). In about July 2003, Graziano asked Morrow whether he could do anything about it. Morrow, assuming Graziano wanted him to assault the Grahams, demurred, afraid that he would

---

dishonesty or false statement. With respect to his psychiatric consultations, Morrow conceded he told doctors he heard voices but claimed he lied about this so that he could obtain medication. (T 517-18).

be caught on their surveillance cameras and arrested. (T 531). However, after thinking about it further, Morrow decided that he could set a fire at Roseanne's and that he would charge Graziano $1000. (T 532-33).

First, however, Morrow looked for help. He asked a childhood friend, Troy Holt, to help him set the fire. Holt declined. (T 694-95). Then he went to William Norman, a friend from the Lake Grove Treatment Center, where they had both gone in 2002 for drug and alcohol rehabilitation. Morrow had since been expelled for allegedly assaulting a female resident (T 573), but Norman was still there (T 534). Norman was a 49-year-old convicted burglar and drug dealer, a lifelong heroin addict, and a veteran of numerous rehabilitation clinics where he saw psychiatrists for diagnosed mental illnesses including schizophrenia. (T 443-48). Morrow asked Norman to help him set a fire,[9] offering to pay Norman $250. Norman agreed. (T 534-35).

---

[9]     Norman, in his initial post-arrest statement, told agents that Morrow first asked him to help damage property and only told him it would be a fire as they were on the way to the job. Several months later, when he met with the prosecutor and agents to begin preparing for the trial, he said that Morrow told him it would be a fire from the beginning. He said that he lied initially to minimize his role and because he had no cooperation agreement at the time. (T 464-66). Defense counsel cross-examined him extensively on the inconsistency. (T 487-95). In light of Graziano's professed intention to take the stand and testify that he hired Morrow, but only to break a window, Norman's changed story was significant. But once Graziano abandoned that defense and elected not to testify, it became much less so.

-13-

Around August 8 or 9, 2003, Morrow went back to Copperfield's.  He and Graziano stepped outside.  He told Graziano he had a solution -- "there was going to be a small fire." (T 536).  Graziano asked how much, and Morrow said $1000.  Graziano told him to do it and asked when it would be.  Morrow responded that it would be in two to three days.  Graziano shook Morrow's hand and walked inside.  They did not discuss how Morrow would start the fire, or that he had recruited Norman.  (T 536-37).  Morrow went back to Copperfield's once more on the evening of August 9 (and was captured on Roseanne's surveillance video), but Graziano was not there.  (T 552).

On the evening of August 10, 2003, Morrow borrowed his then-girlfriend's car and picked up Norman at the Lake Grove Treatment Center.  They first drove to Brooklyn to purchase heroin -- Morrow because he doubted he could set the fire while sober, and Norman because he was an addict.  (T 538, 456).  After taking the heroin, Morrow became very intoxicated and had to park for at least two hours.  They then drove back to Long Island and stopped at a gas station where Morrow filled up a plastic container with gasoline.

They then drove to Copperfield's, arriving at about 4:00 a.m.  Lights were still on and a motorcycle was parked in front.  They parked around the corner and waited.  (T 540-41).  Eventually, the lights went out and someone drove off on the motorcycle.  (T 541).  There were no other lights on in the

-14-

building, and  neither Morrow nor Norman gave any thought to residents of the building.  (T 495, 541).  They donned hooded sweatshirts to hide their faces from the surveillance cameras. (T 542-43).  Morrow stuffed an oily rag into the container of gasoline.  (T 463).  Norman took the container, and Morrow grabbed a rock.

They went to Roseanne's, where Morrow threw the rock through the front window and Norman, after lighting the rag, threw the container, which ignited immediately in a "big ball of flames," through the broken window.  (T 543).  They fled and Morrow drove Norman back to Lake Grove.  (T 544).  The fire forced the evacuation of the tenants in the second-floor apartments above the store, including Vassino, who was treated at a local hospital for burns and smoke inhalation.  (T 128).

Late on the morning of August 11, Morrow drove back alone to New Hyde Park.  The block around Roseanne's was cordoned off and filled with emergency and law enforcement vehicles. Morrow found Graziano in the middle of the street and told him that he needed to get paid.  Graziano told him to come back in an hour or two.  Morrow did and found a woman at the front door of Copperfield's who told him to go around back.  Graziano was in the driveway there.  No one else was around.  Graziano reached out with a handful of money to shake Morrow's hand.  They shook hands and Morrow took the money.  (T 545-47).  Graziano told Morrow he was a "crazy motherfucker," to which Morrow replied

-15-

that it was "just business."   (T 547).

Morrow left, drove down Jericho Turnpike, and went to Mavis Car Center where he had $725 worth of work done on his girlfriend's car.  He paid with the cash Graziano had given him. Morrow saw Graziano only once after that.  (T 547-48).  After "some time," he asked for a $100 loan from Graziano, who gave it to him.

Detective Raymond Kurz with the NCPD Arson Bomb Squad recovered from inside Roseanne's a digital surveillance system. (T 118).  Detective James Turner of the NCPD went through the footage contained on the system's hard drive and extracted footage of Morrow and Norman, whose faces were obscured by their hoods, setting the fire at Roseanne's.  (T 123-24).  Detective Turner determined that the system had approximately a two-day capacity, and once that limit was reached, the system began to overwrite existing footage.  This meant that all that remained was footage of the 47 hours immediately preceding the fire.  (T 124-25).  Detective Turner provided a copy of that footage to NCPD Arson Bomb Squad Detective Brian Kaminski (T 125), who reviewed all of it and found only one other segment, the August 9 visit, in which Morrow appeared.  (T 735).

Toland stopped by Copperfield's some time after the fire and saw that Roseanne's was gutted and boarded up.  He asked Graziano about it.  Graziano smiled and said he heard it was a bad fire and that some "Mexicans" (an apparent reference to the

-16-

tenants above Copperfield's) had been "on fire."  (T 380).

On July 13, 2004, Detective William Moylan, then in the NCPD's Crime Against Property Squad, computer crimes section, examined a computer obtained from Graziano's home in Oceanside, New York.  Moylan found forensic evidence that someone using the computer had conducted an America Online web search using the key phrase "arson laws."  (T 723, 728).

In the fall of 2004, Morrow told a friend from Alcoholics Anonymous, James Eberle, that he had committed an arson at a business on Jericho Turnpike.  He told Eberle that a local bar owner had hired him to do it, that he was paid $1000 and that he had split the money with a friend from "rehab" who helped him to set the fire.  Eberle drove by Roseanne's to confirm Morrow's story and saw the business boarded up.  In 2005, Morrow stole mountain bicycles from Eberle, and Eberle became frightened that Morrow might burn down his house, so he reported to a policeman he knew that he believed Morrow was responsible for the Roseanne's fire.  The NCPD came to interview Eberle shortly thereafter.  (T 707-09).

On February 7, 2007, Morrow pled guilty in the Eastern District of New York to conspiracy to commit arson, in violation of 18 U.S.C. § 844(n), for setting the Roseanne's fire, and executed a cooperation agreement with the government.  On February 8, 2007, William Norman similarly pled guilty to conspiracy to commit arson and also entered into a cooperation

-17-

agreement.

On June 28, 2007, federal agents arrested Graziano, who in the car on the way to the field office told them "all you have is the word of a crackhead."  (T 737).

<u>RELEVANT PROCEDURAL HISTORY</u>

I.   <u>The Admission of Prior Bad Acts Evidence</u>

   A.   <u>The Government's In Limine Motion</u>

      On January 13, 2008, the government filed an <u>in limine</u> motion providing notice of its intention to offer evidence of prior threats and bad acts by Graziano.  (P 41).  In the motion, the government gave notice of five specific threats or acts:

   - on or about September 26, 1999, the day after the Grahams called the police to report late night noise and mayhem at Copperfield's, Graziano told Joseph Graham, in substance, "I am connected and protected – you don't want to get hurt, do you?" (P 41, p. 4);

   - later that day, Graziano came into Roseanne's, where Anna Graham was working alone, brandished a handgun and angrily warned her not to call the police about Copperfield's anymore (<u>id</u>.);

   - on or about April 10, 2000, as Anna Graham arrived at Roseanne's, Graziano walked past and told her to "kiss your husband goodbye . . ." (<u>id</u>.);

   - on or about October 25, 2000, again as Anna Graham arrived at Roseanne's and walked past Graziano, he warned her "I'm going to hurt your business the way you hurt mine . . ." (<u>id</u>. at 4-5);

   - on or about September 11, 2001, after complaining about the Grahams' recent actions, Graziano asked Patrick Toland to arrange to have the Grahams assaulted; Toland had Javier Reyes[10] recruit two men for the job and Toland then drove the men past Roseanne's.  (<u>id</u>. at 5).[11]

---

[10]   Toland and Reyes were identified as "CW 1" and "CW 2," respectively, in the January 13 filing.  Their names later became public when they were called as witnesses at trial.

[11]   With respect to the attempted assault, the government also proffered that, on or about November 11, 2001, in a scene

The government argued that these acts were inextricably intertwined with the charged conduct because the arson was the culmination of "an almost four-year history of acrimony" between Graziano and the Grahams and because "[b]ut for those events, [Graziano] would not have ordered the fire." (Id. at 6). The government argued in the alternative that the evidence should be admissible under Fed. R. Evid. 404(b) as evidence of motive.

> 2.   The Court's Ruling

On March 20, 2008, after Graziano responded to the government's motion, the Court issued a written decision holding the evidence admissible. United States v. Graziano, 558 F. Supp. 2d 304 (E.D.N.Y. 2008). Specifically, the Court ruled that evidence of the prior threats and the unsuccessful assault attempt was admissible both as background to the charged crime and under Fed. R. Evid. 404(b). Id. at 319. With regard to the first ground, the Court ruled:

> [I]f the jury were only allowed to consider
> the evidence of the arson in isolation,
> without reference to prior alleged escalating
> threats and actions towards the owners of
> Roseanne's, the jury may be unable to
> understand why an individual would resort to
> such a drastic and violent criminal act as

captured on videotape, two hooded figures approached the front of Roseanne's and crouched down as one began pulling something from his trousers. Joseph Graham yelled to his wife to call 911 as he reached behind his back, feigning that he had a weapon, and the two individuals fled. (P 41, p. 5). However, the Court excluded this portion of the evidence because the identity of the persons depicted in the video was unclear.

-20-

> arson to deal with his alleged dispute with
> the owners.

Id. (citing United States v. Moore, 735 F.2d 289, 292 (8th Cir. 1984)).  The Court added that, even though the alleged assault attempt was unsuccessful, it was also probative because it helped the jury to understand why the defendant allegedly resorted to arson.  Id. at 319-20 (citing United States v. Serang, 156 F.3d 910, 915 (9th Cir. 1998)).  Ultimately, the Court held that the prior threats and the assault attempt were "inextricably intertwined with the charged arson and . . . clearly necessary to complete the story of the crime on trial."  Id. at 320.

The Court next considered the admission of the prior threats and assault attempt under Rule 404(b).  Citing United States v. Brennan, 798 F.2d 581, 589 (2d Cir. 1986), and United States v. Guang, 511 F.3d 110, 121 (2d Cir. 2007), the Court engaged in a three-part inquiry: (1) whether the evidence was being offered for a proper purpose; (2) whether it was relevant to a material issue in dispute; and (3) whether the probative value outweighed the danger of unfair prejudice under Fed. R. Evid. 403.  Id. at 321.  First, the Court found the government's purpose proper:

> This proof regarding the alleged acrimonious
> relationship over a several year period
> between the defendant and the owners of
> Roseanne's, and the alleged unsuccessful
> prior attempts to intimidate the owners into
> ceasing their complaints about Copperfield's
> to law enforcement and other authorities, is
> extremely probative on the issue of motive.

-21-

Id.  Second, the Cuort found, based upon submissions from and oral arguments by counsel, that motive and intent were both in vigorous dispute.   Id.

Finally, the Court conducted a balancing test under Rule 403 and found that prior acts evidence was highly probative and there was little danger of unfair prejudice.  Id. at 323. This was especially so, the Court pointed out, because the prior acts were substantially less violent than the charged crime. Graziano, 558 F. Supp. 2d at 323 (citing United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999)).  The Court noted that it could also issue a limiting instruction to the jury on the evidence's limited purpose.[12]

II.  The Rule 29 Decision on Counts One and Two

At the close of the government's case, Graziano moved for acquittal pursuant to Fed. R. Crim. P. 29(a).  The Court denied the motion with respect to Counts One and Two of the superseding indictment and reserved decision with respect to Count Three.  (T 778-84).  The defense rested and did not renew the motion with respect to Counts One and Two.  (T 789).

III. The Court's Jury Charge

After closing arguments, the Court charged the jury.

_____

[12]    The Court went on to issue such a limiting instruction twice during the trial (T 166, 432-34) and once during jury instructions, as it pointed out in a footnote appended to its decision when finally published some months after the trial. Graziano, 558 F. Supp. 2d at 323, n.6.

(T 917-969).  Relevant to this motion, the Court instructed the jury that it could find Graziano guilty of Count Two, arson, if it found that he aided and abetted another individual to commit arson.  (T 942-45).[13]  To find Graziano guilty of aiding and abetting, the jury had to:

> find beyond a reasonable doubt that the government ha[d] proved, one, that another person actually committed the offense with which the defendant [was] charged, and, two, that the defendant aided or abetted that person in the commission of the offense.

(T 943).  To aid or abet in the commission of a crime, the Court explained, a defendant must:

> willfully and knowingly associate[] himself in some way with that crime, and ... willfully and knowingly [seek] by some act to help make the crime succeed ... the defendant must consciously share in the criminal act and must share in the original intent of the person who actually committed the crime.

(T 943).  The Court cautioned, however, that

> a person cannot be found guilty of aiding and abetting a crime that has already been completed.  The mere fact that someone provides assistance to another person who has committed a crime, after the crime was committed, does not make him an aider and abettor.

(T 943-44).

---

[13]    The Court also instructed the jury that it could find the defendant guilty of Count Three under an aiding and abetting theory.  (T 957-59).

IV.  <u>The Rule 29 Decision on Count Three</u>

        Following the jury's March 5, 2008 verdict of guilty on all three counts in the indictment (T 997-1000), Graziano renewed his Rule 29 motion with respect to Count Three (T 1002).  On September 10, 2008, following briefing by the parties, the Court issued a written decision granting Graziano's motion on the grounds that it was not reasonably foreseeable to Graziano that Morrow would use a destructive device to start what Morrow had described as a "small fire."  <u>United States v. Graziano</u>, 616 F. Supp. 2d 350, 353 (E.D.N.Y. 2008).

V.  <u>Frank Morrow's Recorded Jail Telephone Conversations</u>

        On May 5, 2008, enclosed with a letter to defense counsel which was copied to the Court, the government supplied recordings of eight telephone calls placed by Morrow on April 15, 2008 from the Queens Private Correctional Facility.  (P 94).

        In one of those calls, Morrow, speaking to his father, said that he was going to tell the Court that he "[didn't] know Carmine Graziano," that he "never started a fire for him," and that he "didn't take two cents from him."  (P 91-2, p. 1).[14]

        Morrow, clearly agitated, went on to say "I'm gonna tell them [at sentencing day] that [Federal authorities]

_____

[14]    The government never transcribed the recordings, but defense counsel transcribed this particular recording, deeming it "Telephone Call No. 8," and filed it with the Court.  (P 91-2; Br. Ex. A).  For purposes of the instant motion only, the government is assuming, without conceding, that this is an accurate and verbatim transcript of the call.

-24-

threatened my life to get me to say the things I said ...."  (Id. at 2).  Morrow said also that "I'm going to look for Brian Kaminski,[15] I'm gonna burn his house down with his wife in it," and added "I hope that's recorded on this phone line."  (Id.) Morrow even vowed to "go after Denis Hurley and Evan Williams" – respectively, his sentencing judge, whom he had never even met (Morrow pled guilty before a magistrate judge), and the federal prosecutor who had offered him a cooperation agreement.

Notably, Morrow appeared to be upset chiefly because he believed that jail officials had accused him falsely of assaulting a jail employee.  He was also impatient with federal authorities, whom Morrow felt should have had him transferred to another facility following the incident.  (Id. at 3-5).

Defense counsel's response to the disclosure was swift and vigorous.

- On May 10, 2008, counsel wrote the government and copied the Court to request: (i) that the government preserve and  subpoena all recorded telephone calls which Morrow placed from jail; (ii) that the government provide them all to the defense.  (P 91).

- Counsel enclosed with this letter, ostensibly for the benefit of the Court (since the government had of course already heard the recordings), a transcript of Morrow's vitriolic telephone call described above.  (P 91-2).

- On May 14, 2008, counsel again wrote the government and copied the Court, this time with an expansive demand

---

[15]   Detective Brian Kaminski of the Nassau County Police Department's Arson Bomb Squad was the officer who arrested Morrow.

for all recordings containing, in addition to exculpatory or impeachment material, any reference at all to Morrow's cooperation, his charges, the trial, or to "fire." (P 93).

- On May 21, 2008, counsel moved the Court to direct the government to disclose all recordings falling into the categories enumerated in their May 14, 2008 demand. (P 96).

- On June 20, 2008, after entertaining oral argument, the Court directed the government to comply fully with the defense's discovery demand (or, in the alternative, to turn over <u>all</u> of the recordings). (P 98).

- On August 4, 2008, the government provided defense counsel with copies of approximately 225 of Morrow's recorded telephone calls from the Nassau County Correctional Center and the Queens Private Correctional Facility. (P 100).

- On August 5, 2008, counsel requested, and was granted, an extension to September 15, 2008 of the deadline, originally August 15, to notify the Court of their intention to seek Rule 33 relief (P 102); at counsel's request, that deadline was twice more extended, ultimately to October 17, 2008. (P 105, 108, 109).

- On September 19, 2008, defense counsel renewed their demand that the government turn over <u>all</u> of Morrow's recorded phone calls, asking the Court to issue a subpoena to that effect, on grounds that the detective reviewing most of the calls was not an attorney and therefore would be unable to determine which calls should be disclosed to the defense. (P 106).

- On October 14, 2008, more than two months after the government had turned over the recordings, counsel finally submitted a letter to the Court indicating that they had reviewed the recordings with Graziano and that, "based on this review," Graziano would not be seeking Rule 33 relief at that time but asserted his right to do so in the future if new evidence were discovered. (P 110).

VI.  <u>Sentencing</u>

The Court sentenced Graziano on July 1, 2009 and considered four issues which were later raised by Graziano on appeal.  First, the Court found that Graziano's offense created a substantial risk of death or serious bodily harm to any person other than the participants and that the risk was created knowingly, resulting in an elevated base offense level.  <u>See</u> U.S.S.G. § 2K1.4(a)(1)(A).  While acknowledging the heightened <u>mens rea</u> requirement, the Court found that Graziano knew that even a small fire set in a card store filled with paper could spread and cause substantial damage, creating a substantial risk both to firefighters and to the tenants of the apartments above the store, especially Vassino.  (ST 9-13).

Second, the Court found that Graziano was a manager and supervisor of Morrow, resulting in a two-level increase in his base offense level.  <u>See</u> U.S.S.G. § 3B1.1(c).  The Court rejected Graziano's argument that Morrow "recruited himself."  (ST 17).  Graziano was the one with a motive to harm the Grahams and he recruited Morrow to do that.  Graziano had control over everything except the method used to accomplish the arson.  (ST 16-21).

Third, the Court found that the offense caused extreme psychological injury to Joseph Graham.  <u>See</u> U.S.S.G. § 5K2.3.  (ST 25-34).

The Court applied a three-level enhancement for the

-27-

psychological injury: two levels because of its severity and one level because Graziano ordered the fire specifically as psychological intimidation. (ST 34).

After applying all of these enhancements and departing horizontally to treat Graziano as Category II offender after finding that his criminal history was underrepresented (which Graziano did not contest on appeal), the Court found that Graziano's total offense level was 29, resulting in a Guidelines range of imprisonment of 97 to 121 months. (ST 35).

Ultimately, the Court imposed a sentence of 180 months, some 60 months above the upper end of the Guidelines range (ST 57),[16] and noted that this was the first time in three-and-a-half years on the federal bench that the Court had upwardly departed. (ST 58). The Court first made clear that it would have imposed this sentence even if the Guidelines range had been lower.

> First, I want to note even if my guidelines calculation is inaccurate, and I understand [defense counsel] disagrees with my calculation, but I reach this 15 year sentence regardless and for all of the reasons I'm about to state. In other words, even if the range were some lower amount as the defense contends, I would give this non-guideline sentence, based upon all the factors under 3553(a), and in fact, this is a non-guideline sentence even based upon the guideline range of -- that I have reached at the high end of 121 months, and I will note

---

[16]     Moreover, the 180-month prison term was nearly 100 months higher than the 84-month Guidelines sentence calculated and recommended by the United States Probation Department. (PSR ¶ 87).

> that it is not my practice to upwardly
> depart, and I don't believe in . . . three
> and a half years I have given any non-
> guideline sentence that is above the advisory
> range.  But if there was ever a case, ever a
> case that warrants this severe sentence, this
> is it, not matter how you calculate it, under
> the guidelines or in this case when you
> consider all the 3553(a) factors, because the
> guideline range is woefully inaccurate [sic]
> to reflect all of the factors that Congress
> has set forth.

(Id.).

VII. The Appeal

On July 17, 2009, counsel timely filed Graziano's notice of appeal and on February 11, 2010, timely filed his brief.  (PA 3).  Graziano raised five claims on appeal.

Graziano claimed that the Court erred in admitting evidence of his prior threats and bad acts against the arson's primary victims.  (App. 25-35).

Graziano raised three challenges to his Sentencing Guidelines calculation.  First, he claimed the Court erred in finding that the arson caused extreme psychological injury to one of the victims.  (App. 36-43).  Second, he claimed that the Court erred in finding that he knowingly created a substantial risk of death or serious bodily injury.  (App. 44-47).  Third, he claimed that the Court erred in finding that he was a manager and supervisor of the offense.  (App. 48-51).

Finally, Graziano contended that the Court's sentence was procedurally and substantively unreasonable.  (App. 52-58).

-29-

On August 31, 2010, a three-judge panel of the Second Circuit Court of Appeals heard oral argument, and on September 7, 2010 issued a summary order and judgment affirming the July 1, 2009 judgment of this Court.  (PA 5).  On July 1, 2011, the United States Supreme Court denied Graziano's Writ of Certiorari. (PA 6).

ARGUMENT

POINT I

THE SUPERSEDING INDICTMENT
SUFFICIENTLY CHARGED GRAZIANO
WITH AIDING AND ABETTING ARSON
AND THE COURT CORRECTLY INSTRUCTED
THE JURY ON AIDING AND ABETTING

Graziano claims that he was convicted improperly of arson, Count Two of the indictment, on an acting in concert theory, because trial counsel rendered ineffective assistance by failing either: (i) to challenge the facial sufficiency of the indictment on grounds that it did not adequately plead aiding and abetting; or (ii) to challenge as a constructive amendment of the indictment the Court's instruction to the jury that it could convict Graziano of aiding and abetting arson.  (Br. 17-23).  Graziano's claim is meritless.  The indictment included both charging language and a statutory citation indicating clearly that the Grand Jury had charged Graziano with aiding and abetting arson.  Thus, because the evidence at trial supported such a theory, the Court was not only correct, but bound, to instruct the jury on aiding and abetting.

A.   Applicable Law

1.   Ineffective Assistance

As an initial matter, to establish ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that the poor performance prejudiced the

-31-

outcome of the proceeding.  See Strickland v. Washington, 466 U.S. 668, 687-688 (1984); see also United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2004); Chang v. United States, 250 F.3d 79, 84 (2d Cir. 2001).

In assessing the first Strickland prong, the Court must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  United States v. Jones, 918 F.2d 9, 11 (2d Cir. 1990); see also Sacco v. Cooksey, 214 F.3d 270, 274 (2d Cir. 2000) (counsel's decision not to call specific witnesses and seek introduction of specific conversation objectively reasonable, given serious potential downside); United States v. Cruz, 785 F.2d 399, 405 (2d Cir. 1986) (extensive preparation pointed to reasonableness of counsel's conduct). Matters of judgment and strategy "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.

In assessing the second Strickland prong, the Court must determine whether "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  Speculative arguments about an error's impact do not establish prejudice.  See United States v. Weiss, 930 F.2d 185, 199 (2d Cir. 1991).  Moreover, the prejudice prong need not be considered if a defendant has failed to demonstrate that counsel

has performed below an objective standard of reasonableness.  See United States v. Vegas, 27 F.3d 773, 778 (2d Cir. 1994).

Ineffectiveness claims can be raised about possible pretrial motions.  See, e.g., United States v. Abad, 514 F.3d 271, 275 (2d Cir. 2008) (speedy trial); Lynn v. Bliden, 443 F.3d 238, 250 (2d Cir. 2006) (identification procedures); United States v. Kurti, 427 F.3d 159, 163 (2d Cir. 2005) (multiplicity); United States v. Bayless, 201 F.3d 116, 130 (2d Cir. 2000) (recusal); United States v. Stantini, 85 F.3d 9, 20 (2d Cir. 1996) (disqualification of counsel); United States v. Hon Yee-Chau, 17 F.3d 21, 27 (2d Cir. 1994) (suppression & venue); United States v. Zackson, 6 F.3d 911, 921 (2d Cir. 1993) (severance); United States v. Di Tommaso, 817 F.2d 201, 215 (2d Cir. 1987) (discovery).

Such claims can succeed, however, only if the motion would have had merit.  See Abad, 514 at 275 ("counsel could not ... have been ineffective for failing to make a motion that would have been futile"); Hon Yee-Chau, 17 F.3d at 27 ("[c]ounsel's failure to move for suppression of [the defendant's] statement is understandable, since the statement appears to have been properly obtained"); Zackson, 6 F.3d at 921 (counsel not ineffective for failing to move for severance of charges because "evidence of both conspiracies would have been admissible under Rule 404(b) in a separate trial of either one ...).

Ineffectiveness claims can also be raised about the

-33-

failure to object to jury instructions.  <u>See</u>, <u>e.g.</u>,; <u>Cox v.
Donnelly</u>, 432 F.3d 388, 390 (2d Cir. 2005); <u>United States v.
Brooks</u>, 82 F.3d 50, 54 (2d Cir. 1996); <u>Hon Yee-Chau</u>, 17 F.3d at
27.

　　　　To succeed, however, such a claim must identify
specific instructions and errors.  <u>See</u> <u>Hon Yee-Chau</u>, 17 F.3d at
27 (counsel's failure to object to jury instructions not
ineffective assistance because "[defendant] does not argue that
any specific instructions were objectionable"); <u>Brooks</u>, 82 F.3d
at 54 (counsel not ineffective in failing to challenge conspiracy
instruction which was "proper [and] ... a standard recitation of
... conspiracy law"); <u>cf.</u>, <u>Cox</u>, 432 F.3d at 390 (in New York
State homicide case, counsel ineffective in failing to object to
"erroneous jury instruction which impermissibly shifted to his
client the burden of proving that he did not intend 'the ordinary
consequences of his voluntary acts'").

　　　　Finally, a 2255 petition is an appropriate vehicle for
raising an ineffectiveness claim, even for the first time, as
there is no procedural default occasioned by failing to raise an
ineffective assistance of counsel claim on direct appeal.  <u>See</u>
<u>Massaro v. United States</u>, 538 U.S. 500, 507 (2003).  Moreover,
ineffectiveness claims generally should be made first anyway to
the district court, which can make factual findings.  <u>See</u> <u>United
States v. Matos</u>, 905 F.2d 30, 32 (2d Cir. 1990).

2.   Facial Sufficiency

An indictment is not required to be technically perfect, and will not be dismissed if the defect within it does not prejudice the defendant.   See Smith v. United States, 360 U.S. 1, 9 (1959).   The indictment must meet certain minimum standards:

> "As the Supreme Court and the Second Circuit have repeatedly stated, 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.' (Citations omitted.)   In order to satisfy these requirements, 'an indictment need to do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"

United States v. Heredia, 2003 WL 21524008, *3 (S.D.N.Y. July 3, 2003) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974), and citing United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002)(internal quotations omitted), respectively).   See also United States v. Nersesian, 824 F.2d 1294, 1323 (2d Cir. 1987) (approving language of "on or about" certain date); United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000); United States v. Fruchter, 104 F.Supp.2d 289, 298 (S.D.N.Y. 2000).

This is especially true with aiding and abetting, which need not be specified in the indictment at all.   See United States v. Mucciante, 21 F.3d 1228, 1234 (2d Cir. 1994) ("an

-35-

aiding and abetting charge is arguably implicit in every indictment"); United States v. Smith, 727 F.2d 214, 217 (2d Cir. 1984).  A fortiori, when an indictment actually charges a violation of Title 18, United States Code, Section 2, the defendant is clearly on notice of his potential liability as an aider and abettor.  See Mucciante, 21 F.3d at 1234 (defendant's indictment "expressly charged him with violating 18 U.S.C. § 2 ... and, therefore, [defendant] was on actual notice that he could be convicted of aiding and abetting another person"); United States v. Robinson, 956 F.2d 1388, 1394-95 (7th Cir. 1992).

     3.   Constructive Amendment

     A constructive amendment arises when the government's proof and the trial court's jury instructions:

> modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.

United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996).

     But "inclusion of an aiding and abetting charge to the jury will rarely, if ever, constructively amend an indictment ...." Mucciante, 21 F.3d at 1234.  In fact, the Court may properly issue an aiding and abetting instruction even if 18 U.S.C. § 2 is not expressly charged in the indictment.  See id.; United States v. Mayo, 14 F.3d 128, 132-33 (2d Cir. 1994); United States v. Damsky, 740 F.2d 134, 140 (2d Cir. 1984); United States

-36-

v. Taylor, 464 F.2d 240, 241 n.1 (2d Cir. 1972).  Ultimately, "an aiding and abetting instruction is appropriate where the prosecution makes it known that it intends to proceed on a theory of aiding and abetting and the evidence so warrants."  Smith, 727 F.2d at 217.

It is only if the indictment is so narrowly drawn that it precludes proof of an essential element of the underlying crime that an aiding and abetting instruction may not be appropriate.  See Mucciante, 21 F.3d at 1234 ("[i]f a fraud indictment, for example, restricted the government to proving that a particular person was defrauded, it may well be that a jury charge that permitted a conviction for defrauding a different victim would constructively amend that indictment").

4.  Aiding and Abetting

To convict a defendant of aiding and abetting in violation of 18 U.S.C. § 2, the government must prove:

> that the underlying crime was committed by a
> person other than the defendant, that the
> defendant knew of the crime, and that the
> defendant acted with the intent to contribute
> to the success of the underlying crime.

United States v. Hamilton, 334 F.3d 170, 180 (2d Cir. 2003).  See also United States v. Pipola, 83 F.3d 556, 562 (2d Cir. 1996); United States v. Labat, 905 F.2d 18, 23 (2d Cir. 1990); United States v. Wiley, 846 F.2d 150, 154 (2d Cir. 1988).[17]  And while a

_____

[17]  The Second Circuit appears to have consolidated its explanation of the legal standards applicable to prosecution on

-37-

defendant may not be convicted of aiding and abetting a crime which has already been committed, <u>see</u> <u>Hamilton</u>, 334 F.3d at 180, <u>United States v. Shulman</u>, 624 F.2d 384, 387 (2d Cir. 1980), neither must a defendant know all the details of the crime to be guilty of aiding and abetting.  <u>United States v. Grubczak</u>, 793 F.2d 458, 463 (2d Cir. 1986); <u>Wiley</u>, 846 F.2d at 154; <u>Aiello</u>, 864 F.2d 257, 263 (2d Cir. 1988).

B.    <u>Argument</u>

   1.    <u>Facial Sufficiency</u>

        Graziano argues that counsel was ineffective for failing to challenge the facial sufficiency of the indictment because the statutory citation to aiding and betting in Count Two appeared in parentheses following the charging language and thus the indictment gave no "inkling" Graziano was charged with or would be prosecuted for aiding and abetting others to commit an

_____

an aiding and abetting theory; earlier explanations were more expansive:

> To convict a person of aiding and abetting the government must prove (1) commission of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider or abettor, with (4) the specific intent that his act or omission bring about the underlying crime .... To prove the existence of (3) and (4), the evidence must demonstrate that the person charged joined the venture, shared in it, and that his efforts contributed towards its success.

<u>Wiley</u>, 846 F.2d at 154, <u>quoting</u> <u>United States v. Zambrano</u>, 776 F.2d 1091, 1097 (2d Cir. 1985).

arson.  (Br. 21).

Notwithstanding Graziano's <u>pro</u> <u>se</u> status, this is a
wholly frivolous argument.  First, he cites absolutely no
authority for the proposition that statutory citations must
appear in the charging language itself (or in any other
particular place in the indictment).  Second, the underlying
charge, arson, 18 U.S.C. § 844(i), is also listed only in the
parenthetical, and Graziano does not contend that was error.[18]

More broadly, Graziano cannot seriously contend that he
was not on notice the grand jury had charged him with aiding and
abetting others to commit arson.  To begin with, in addition to
the statutory citation, Count Two included the words "together
with others."  (P 61).  More significantly, Graziano's case sent
to trial on February 25, 2008, some eight months after his arrest
on June 27, 2007, and the government made its theory of
prosecution crystal clear from its very first filing following
unsealing of the indictment – a letter to United States
Magistrate Judge Michael Orenstein urging Graziano's detention:

> By August 2003, the defendant was desperate
> to be rid of Roseanne's owners.  An

---

[18]  Graziano may be excused from knowing that the standard
convention in <u>all</u> informations and indictments issued in the
Eastern District of New York is to list the charges in
parentheses following the charging language.  While this fact is
not a part of the instant record, and thus the government does
not rely on it here, it bears note that defense counsel, an
experienced practitioner in the district, certainly would have
known this, and accordingly would have dismissed Graziano's
argument.

> eyewitness will testify that the defendant
> found an individual who was willing to start
> a fire at Roseanne's, and promised the person
> cash.  Following the fire, the defendant paid
> the individual for burning the store.

(P 6, p. 3).  This was hardly news to Graziano, who told the

arresting officers earlier in the day that "all you have is the

word of a crackhead."  (T 737).  Over the next eight months,

numerous filings by both the government <u>and</u> the defense evidenced

Graziano's clear understanding of the government's theory of

prosecution, including, notably, Graziano's proposed jury charge,

filed February 28, 2008, which addressed aiding and abetting <u>on</u>

<u>the very first page</u>.  (P 47, p. 1).

    2.  <u>Constructive Amendment</u>

      Graziano argues further that counsel was ineffective in

failing to object to the Court's jury instruction on aiding and

abetting as a constructive amendment "because the jury may have

reached its verdict on the basis of the legally inadequate

instructions on principal or aider and abettor liability under §

844(i) and § 2 ...."  (Br. 21).

      This argument is equally unavailing.  First, the Court

was entitled to issue an aiding and abetting instruction, based

on the evidence at trial, regardless of whether aiding and

abetting was expressly charged in the indictment.  <u>See</u> <u>Mucciante</u>,

21 F.3d at 1234.  The evidence – primarily Frank Morrow's

testimony about the night of August 11, 2003 and the days

beforehand (T 530-547) – amply justified such an instruction.

-40-

Second, *a fortiori*, aiding and abetting <u>was</u> expressly charged in the indictment, as discussed above, making Graziano's claim even more implausible.  <u>Id</u>.

Third, Graziano identifies neither the faulty portion of the aiding and abetting instructions nor the error which made them "legally inadequate."  (Br. 21).  <u>See</u> <u>Hon Yee-Chau</u>, 17 F.3d at 27; <u>Brooks</u>, 82 F.3d at 54.  To the contrary, the authorities Graziano cites – <u>Hamilton</u>, 334 F.3d at 180, <u>Pipola</u>, 83 F.3d at 562, and <u>Labat</u>, 905 F.2d 23 – set out substantially the same elements which the Court cited in its aiding and abetting instruction to the jury (T 943).  Graziano's other concern, that one cannot aid and abet a completed crime, <u>see</u> <u>Hamilton</u>, 334 F.3d at 180, was also addressed in the Court's instruction.  (T 943-44).

3.   <u>Ineffective Assistance</u>

In sum, Graziano's claim fails both prongs of the <u>Strickland</u> test.  First, counsel's failure to challenge either the facial sufficiency of the indictment – on grounds that Count Two did not adequately charge aiding and abetting – or the Court's aiding and abetting instruction, as a constructive amendment to the indictment, were clearly objectively reasonable because such challenges would have had absolutely no merit, and likely would have been dismissed as frivolous by the Court.  In fact, the filing of such motions would have called into question counsel's basic competence.

-41-

Second, and similarly, counsel's failure to file such motions caused absolutely no prejudice to Graziano because they were meritless and because they would have been denied anyway. The government's theory of prosecution – that Graziano hired someone to set a fire at Roseanne's – was made clear from the start, never varied, and was supported by the testimony of Frank Morrow and others at trial.

POINT II

COUNSEL'S DECISION
NOT TO SEEK A NEW TRIAL
DID NOT CONSTITUTE
INEFFECTIVE ASSISTANCE

Graziano claims that counsel's decision not to seek a new trial pursuant to Fed. R. Crim. P. 33, following the government's disclosure of a recorded telephone conversation in which trial witness Frank Morrow claimed that he had perjured himself during Graziano's trial, constituted ineffective assistance.  (Br. 23-27).  Graziano's claim is meritless.  In context, Morrow's claim was highly implausible.  Notwithstanding this, however, counsel aggressively and successfully litigated for expansive post-trial discovery and reviewed hundreds of Morrow's recorded telephone calls before finally notifying the Court, some five months after the government's disclosure, that Graziano would not be seeking a new trial.  It was objectively reasonable for counsel to conclude, following such a thorough review, that they could not prove Morrow's trial testimony was false and thus would not prevail on a Rule 33 motion.

A.   Additional Applicable Law

1.   New Trial Motions

Federal Rule of Criminal Procedure permits a defendant to move for a new trial "in the interest of justice."  A motion for a new trial based upon newly discovered evidence, see Fed. R. Crim. P. 33(b)(1), is "not favored and should be granted only

-43-

with great caution." United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1954); see also, e.g., United States v. Gallego, 191 F.3d 156, 161 (2d Cir. 1999). Such motions are appropriately granted "only in the most extraordinary circumstances." United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992).

This is especially so when the new evidence consists of a witness recantation because "such recantations are 'looked upon with the utmost suspicion.'" United States v. Di Paolo, 835 F.2d 46, 49 (2d Cir. 1987), quoting United States ex rel. Sostre v. Festa, 513 F.2d 1313, 1318 (2d Cir.), quoting United States v. Troche, 213 F.2d 401, 403 (2d Cir. 1954), quoting Harrison v. United States, 7 F.2d 259, 262 (2d Cir. 1925). Before granting a new trial on grounds that a witness recanted his testimony, the Court must be satisfied:

> (1) that the testimony recanted was false and material [citations omitted]; (2) that without the original testimony the jury probably would have acquitted the defendant [citations omitted]; and (3) that the party seeking the new trial was surprised when the false testimony was given or did not know of its falsity until after the trial [citations omitted] and could not with due diligence have discovered it earlier.

Di Paolo, 835 F.2d at 49; see also United States v. Moore, 54 F.3d 92, 99 (2d Cir. 1995); United States v. White, 972 F.2d 16, 20 (2d Cir. 1992).

In Di Paolo, the Second Circuit upheld the trial court's denial of the defendants' motion for a new trial, even

though the key prosecution witness, whom they had been convicted of assaulting and raping in order to prevent her from testifying about a postal truck robbery, gave a formal statement of recantation to the defense attorney. Di Paolo, 835 F.2d at 49. The trial court found, and the Second Circuit agreed, that the defendants had failed to demonstrate that the testimony recanted was false, in part because the recantation was "implausible," id. at 50, and because, "[i]n contrast to the alleged recantation, [the victim's] testimony [at trial] was detailed, consistent, and under oath." Id.

B.   Argument

Graziano claims that counsel's decision not to seek a new trial following the disclosure of Morrow's recorded telephone calls constituted ineffective assistance. (Br. 23-27). Graziano is wrong. Counsel's decision was objectively reasonable because they would have had to prove Morrow's trial testimony was false in order to prevail, and this was unlikely because (1) Morrow's recantation was highly suspect and (2) even counsel's exhaustive review of several hundred additional of Morrow's recorded telephone conversations apparently failed to generate additional evidence that Morrow perjured himself at trial.

1.   Morrow's Recantation in "Call #8"

Morrow's purported recantation in what the defense labeled "Call #8" (P 91-2) was highly suspect. It occurred during an unsworn and emotional conversation with his father,

-45-

when he was raging about what he characterized as a false
accusation that he had assaulted a jail official, what he
believed was the government's reluctance to have him transferred
to another jail, and delays in his sentencing.  (P 91-2, p. 2-5).
Morrow ranted on the telephone call that he wanted to slit
someone's throat and start more fires, and that once he was
released, he would do both.  (<u>Id</u>. at 6). He even claimed that
federal officials had "threatened my life to get me to say the
things I said" – a claim absurd on its face.  (<u>Id</u>. at 2).   In
context, Morrow's recantation appears to have been a threat by an
extremely angry man to retaliate against the government, not a
genuine admission that he had perjured himself at trial.

Moreover, Morrow purported to recant even portions of
his testimony which Graziano which had not contested, making the
recantation more implausible.  Morrow claimed that he did not
even know Graziano, and that he had never taken money from him.
(<u>Id</u>. at 1).  Both of these assertions were at odds with the
defense Graziano posited repeatedly in the months leading up to
trial, including in his pretrial motions, and upon which counsel
even opened at trial (T 43-44) – that Graziano hired Morrow to
break a window at Roseanne's, but not to start a fire, and that
Graziano did in fact pay Morrow afterwards.

Finally, Morrow's testimony at trial, in contrast to
the telephone call, was "detailed, consistent, and under oath."
<u>Di Paolo</u>, 835 F.2d at 50.  Morrow was on the stand for most of

-46-

two days, most of that time under withering cross examination by
defense counsel.  (T 504-681).  Morrow's testimony implicating
Graziano also mirrored what he had said in a videotaped statement
to Detective Brian Kaminski and an Assistant District Attorney in
Nassau County immediately following his arrest; while that
statement itself was not in evidence, counsel referred to it
during cross-examination and the government questioned Morrow
about it during re-direct examination.  (T 679).

    2.   <u>Counsel's Review of Morrow's Recorded Telephone Calls</u>

        Counsel's October 14, 2008 letter to the Court
indicating that Graziano would not be seeking a new trial
pursuant to Fed. R. Crim. P. 33 (P 110) came after five months of
aggressive post-trial litigation and more than two months after
the government disclosed some 225 of Morrow's recorded phone
calls for their review.  Counsel successfully moved for expansive
post-trial discovery, including many categories of evidence which
would not have been discoverable before trial pursuant to Fed. R.
Crim. P. 16 or 18 U.S.C. § 3500 – as the evidence was not in the
government's possession.  (P 97).  Even then, counsel still tried
to argue that the government had not disclosed enough and
attempted to have all of Morrow's recorded telephone calls, even
personal calls having nothing to do with the trial, disclosed to
them.  (P 106).  Finally, in the October 14 letter, counsel
indicated that they had reviewed the recordings "with Mr.
Graziano," which Graziano does not now dispute, before arriving

at their decision.

     3.   <u>Ineffective Assistance</u>

Counsel's decision not to file a Rule 33 motion based on Telephone Call #8 was objective reasonable, and did not prejudice Graziano, because Graziano was unlikely to prevail. The Court could have granted such a motion only if Graziano had satisfied all three prongs of the <u>Di Paolo</u> test: falsity; materiality; and due diligence.

As an initial matter, because Graziano could not legally have been convicted at trial without Morrow's testimony, and because Morrow's purported recantation did not occur until after the trial, the government concedes that the second and third <u>Di Paolo</u> prongs are satisfied: materiality and due diligence.

Graziano could not, however, have proved that Morrow's testimony at trial was false.  The only evidence of this was Morrow's recantation.  Here, counsel faced – in addition to the presumption that any recantation is suspect – the difficulty of arguing that Morrow's highly charged and inconsistent statements to his father in Telephone Call #8 – not under oath, not sworn, not repeated, and not even made personally to counsel (<u>see</u> <u>Di Paolo</u>, 835 F.2d at 49) – proved false Morrow's trial testimony, which did not waver even in response to vigorous and lengthy cross examination by defense counsel.  In sum, counsel's decision not to file a meritless motion did not constitute ineffective

-48-

assistance.

POINT III

COUNSEL'S
DECISION NOT TO APPEAL THE
COURT'S DENIAL OF GRAZIANO'S
RULE 29 MOTION AS TO COUNTS
ONE AND TWO ON GROUNDS THAT
MORROW'S TESTIMONY WAS INCREDIBLE
AS A MATTER OF LAW DID NOT
CONSTITUTE INEFFECTIVE ASSISTANCE

Graziano claims that counsel's decision not to appeal
the Court's summary denial of Graziano's motion for acquittal of
Counts One and Two of the indictment pursuant to Fed. R. Crim. P.
29(a) constituted ineffective assistance.  (Br. 27-36).
Graziano's claim is meritless.  Not only did the Court correctly
decide the motion, but the claims which counsel did raise on
appeal – the Court's admission of prior bad acts evidence, and
several issues relating to the Court's imposition of a sentence
some 100 months above Probation's sentencing recommendation – had
far more merit.

A.   Additional Applicable Law

     1.   Motions for Acquittal

A motion for judgment of acquittal may be granted
"after the evidence on either side is closed if the evidence is
insufficient to sustain a conviction" for the crime charged.
Fed. R. Crim. P. 29(a).  In deciding a Rule 29 motion, the Court
must resolve all inferences in favor of the prosecution, and view
the proof in the light most favorable to the government.  See
United States v. Temple, 447 F.3d 130, 137, 139 (2d Cir. 2006);

United States v. Macpherson, 424 F.3d 183, 195 (2d Cir. 2005). The Court may not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence.  See United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000); United States v. Cunningham, 723 F.2d 217, 232 (2d Cir. 1983).  The Court may grant the motion only if the evidence pointing to guilty is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).  Otherwise, it "must let the jury decide the matter." United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972); see also United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) ("[t]hese strict rules are necessary to avoid judicial usurpation of the jury function").

    2.    Sufficiency of the Evidence Claims on Appeal

        A defendant challenging on appeal the sufficiency of the government's evidence faces "a heavy burden." See, e.g., United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998); United States v. Nersesian, 824 F.2d 1294, 1324 (2d Cir. 1987).  The issue is whether "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) ("The ultimate question is not whether

-51-

we <u>believe</u> the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether <u>any rational trier of fact could so find</u>.") (emphasis in original).

Sufficiency claims based on challenges to the credibility of witnesses are usually in vain.  This is because the credibility of witnesses is for the jury to determine.  <u>See Glasser v. United States</u>, 315 U.S. 60, 80 (1942); <u>United States v. Khan</u>, 787 F.2d 28, 34 (2d Cir. 1986) (reviewing court must "resolve all issues of credibility in favor of the prosecution).  Thus, a witness's direct testimony to a particular fact provides sufficient evidence of that fact for purposes of a sufficiency-of-the-evidence challenge.  <u>See United States v. Desena</u>, 287 F.3d 170, 177 (2d Cir. 2002); <u>United States v. Jesperson</u>, 65 F.3d 993, 998 (2d Cir. 1995).  Lack of corroboration for a witness's testimony goes to the weight, not the sufficiency, of the evidence.  <u>United States v. Roman</u>, 870 F.2d 65, 71 (2d Cir. 1989).  A defendant may be convicted on the uncorroborated testimony of a single witness, <u>see</u> <u>United States v. Gonzalez</u>, 110 F.3d 936, 941 (2d Cir. 1997), including an accomplice witness, <u>see</u> <u>United States v. Parker</u>, 903 F.2d 91, 97 (2d Cir. 1990), "so long as that testimony is not incredible on its face and is capable of establishing guilty beyond a reasonable doubt."  <u>United States v. Gordon</u>, 987 F.2d 902, 906 (2d Cir. 1993).[19]

---

[19]   Graziano cites a Fifth Circuit opinion describing what makes testimony "incredible as a matter of law": "if it relates to

To rebut sufficiency claims challenging a defendant's participation in a conspiracy, the government must present "some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." United States v. Gaviria, 740 F.2d 174, 183 (2d Cir. 1984). Mere association with other alleged conspirators is insufficient to prove the defendant's membership in a conspiracy. United States v. Nusraty, 867 F.2d 759, 763 (2d Cir. 1989). What is required is evidence of the defendant's "purposeful behavior" showing a "deliberate, knowing, specific intent to join the conspiracy." United States v. Diez, 736 F.2d 840, 843 (2d Cir. 1984).

3.   Ineffective Assistance by Appellate Counsel

The same standard is used to evaluate the effectiveness of both trial and appellate counsel. See Smith v. Murray, 477 U.S. 527, 536 (1986). The Strickland standard is applicable on direct appeal. See Williams v. Taylor, 529 U.S. 362, 369 (2000). While ineffectiveness is not demonstrated merely by identifying a substantive issue not raised in an appeal brief, see Jones v.

---

facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." United States v. Bermea, 30 F.3d 1539, 152 (5th Cir. 1994). While the government has not located any Second Circuit authority similarly invoking or defining this particular term, the government suggests that this is analogous to the Second Circuit's reference to testimony which is "incredible on its face." Gordon, 987 F.2d at 906.

<u>Barnes</u>, 463 U.S. 745, 754 n.7 (1983) (appellate counsel may be selective in raising non-frivolous issues), it may be demonstrated if a defendant can show that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994). For instance, failure to raise an issue on appeal with a reasonable probability of prevailing has been found to be ineffective assistance of counsel. <u>See</u> <u>Flores v. Demskie</u>, 215 F.3d 293 (2d Cir. 2000) (counsel in New York State case waived <u>Rosario</u> claim which would have entitled defendant to new trial); <u>Jackson v. Leonardo</u>, 162 F.3d 81, 86-87 (2d Cir. 1998) (counsel failed to raise straightforward double jeopardy claim).

B.  <u>Argument</u>

Graziano claims that counsel's failure to raise on appeal the Court's denial of Graziano's Rule 29 motion on Counts One and Two, conspiracy to commit arson, and arson, respectively, on grounds that Frank Morrow's testimony was incredible on its face, constituted ineffective assistance. Graziano is wrong. Graziano's claim is clearly contradicted by the record, which included evidence legally sufficient to convict Graziano of both crimes. Thus, counsel's decision on appeal to forgo pursuing a meritless sufficiency challenge and to concentrate instead on the Court's rulings relating to prior bad acts evidence and sentencing was objectively reasonable.

-54-

1.   <u>Sufficiency of the Evidence for Counts One and Two</u>

Morrow testified that Graziano hired him to set a "small fire" at Roseanne's, asked when it would happen, and agreed to pay him $1000 for it (T 532-37).  Morrow testified that, along with William Norman, he then set that fire.  (T 542-43).  Finally, Morrow testified that Graziano paid him afterwards.  (T 545-47).  Morrow's testimony established the existence of an agreement between Morrow and Graziano to set a fire at Roseanne's and showed that Graziano knowingly and wilfully aided Morrow.  That testimony, considered in the light most favorable to the government, was legally sufficient for a jury to find Graziano guilty of arson conspiracy and arson.

Graziano argues that Morrow's testimony was incredible as a matter of law because: (i) Graziano would not have risked a fire at Copperfield's, which was located next door to Roseanne's; (ii) Graziano did not have fire insurance for Copperfield's, (iii) there was no video evidence corroborating Morrow's account of the meeting where Graziano hired him to commit the arson; and (iv) the policeman who examined the video footage captured in the Roseanne's video surveillance system may have testified incorrectly that the system operated on a continuous 48-hour loop and no footage from more than two days before the fire was recoverable.  (Br. 33).  None of Graziano's points make Morrow's testimony legally incredible.  The arguments, which all concern generally lack of corroboration for Morrow's testimony, go to the

weight of the evidence, not its sufficiency.  <u>Roman</u>, 870 F.2d 65, 71.

Moreover, there were plausible explanations in the trial record for each of the points which Graziano now raises. For example, Graziano's apparent lack of concern about damage to Copperfield's from the fire was not inexplicable.  Morrow testified that he told Graziano it would be a small fire.  (T 536).  Moreover, there were two firewalls and two stairwells between Roseanne's and Copperfield's, one set in each business. (T 63).  Knowing this, Graziano could well have believed a small fire would not affect his business.  Morrow's testimony about Graziano's apparent surprise at the size of the actual fire lends this explanation additional credence.  (T 547).  In any case, counsel raised this argument in his closing, and the jury was not persuaded.  (T 871-72).

Similarly, the lack of video footage in evidence of the meeting where Graziano hired Morrow does not make Morrow's testimony legally incredible.  The meeting could have happened more than 48 hours before the fire and thus the footage was no longer in the surveillance system.  The meeting could have happened inside Copperfield's, notwithstanding Morrow's recollection that they stepped outside – in fact, this is what Graziano was prepared originally to argue, as counsel explained in his opening.  (T 43-44).  In any case, this issue was exploited thoroughly by counsel – both the lack of corroborating

-56-

footage of the Graziano-Morrow meeting, and also the footage which _was_ in evidence, of Morrow, two days before the fire, entering and exiting Copperfield's, but no sign of Graziano – and the jury apparently found the arguments unavailing.  (T 552, 870-71).

Judged in the light most favorable to the government, a rational trier of fact could have found that Carmine Graziano hired Frank Morrow to start a fire at Roseanne's.  The arguments above which Graziano makes now in support of his contention that Morrow's testimony was incredible on its face – arguments which were all raised by counsel at trial, and presumably considered by the jury – are arguments about credibility, not impossibility. The Court correctly denied Graziano's Rule 29 motion on Counts One and Two because, as the Court pointed out, there was sufficient evidence, including testimony from Morrow, Norman and the Grahams, to sustain convictions of those crimes, and the "credibility [of that evidence] is a matter for the jury."  (T 783).

2.  Issues Raised on Appeal

Graziano argues that counsel on appeal "omitted significant and obvious issues" – the sufficiency of the evidence supporting Counts One and Two – while "pursuing issues that were clearly and significantly weaker."  Mayo, 13 F.3d at 533. Graziano is wrong.  As set out above, a sufficiency challenge stood almost no chance of success on appeal.  Counsel focused

instead on fiercely litigated issues – the admission of prior bad acts evidence and sentencing – which had required the Court to make a series of legal decisions and to set out its analysis at length.  This gave counsel ample room to attack the judgment on legal grounds – the appellate court's usual purview – instead of asking the appellate court to "usurp" the jury's role by reviewing its factual determinations, something the court would have been loathe to do.  See Mariani, 725 F.2d at 865.

The Court's admission of prior bad acts evidence had an enormous impact on the trial.  The jury heard about a whole series of escalating incidents between Graziano and the Grahams.  While Morrow's testimony alone was legally sufficient to convict Graziano, it was the prior bad acts evidence which provided a compelling motive for the violent act.  Without it, Morrow's account might have seemed implausible.  As the Court put it:

> [I]f the jury were only allowed to consider
> the evidence of the arson in isolation,
> without reference to escalating threats and
> actions towards the owners of Roseanne's, the
> jury may be unable to understand why an
> individual would resort to such a drastic and
> violent criminal act as arson to deal with
> his alleged dispute with the owners.

Graziano, 558 F. Supp. 2d at 319 (citing Moore, 735 F.2d at 292).

Similarly, the Court's conduct of sentencing was hugely significant because it ultimately resulted in an upward departure of some sixty months – the first time, the Court noted, that it had ever departed upwardly.  (ST 58).  Moreover, the sentence

came after the Court had issued a series of rulings – on extreme
psychological injury, knowing creation of risk of death or
serious bodily injury, and a role enhancement – which resulted in
increasing the Guidelines range from that recommended by
Probation – 84 months – to 97 to 121 months.  Compared to the
original range of 84 months – and the Court noted that it would
have imposed the same sentence even if Probation's recommendation
were still the baseline (ST 58) – the 180-month sentence was an
upward departure of more than 100%.

    3.   <u>Ineffective Assistance</u>

        Appellate counsel's decision to focus on the Court's
admission of prior bad acts evidence and conduct of sentencing,
instead of mounting a sufficiency challenge, was both objectively
reasonable and also caused no prejudice to Graziano.  The
appellate court was very unlikely to find the evidence legally
insufficient in the face of Morrow's unequivocal testimony that
Graziano ordered and paid for the fire, not to mention testimony
from Norman and others corroborating much of Morrow's account,
and testimony from the Grahams and others setting out Graziano's
motive.

        In denying the Rule 29 motion on Counts One and Two,
all the Court did was to cite the well-settled principle that
credibility determinations are the province of the jury, a ruling
leaving the appellate court virtually no room to find error.  By
contrast, the Court's extended analysis on prior bad acts

-59-

evidence and at sentencing was at least subject to attack.

That these challenges failed on appeal was not because counsel's decision to pursue them constituted ineffective assistance.  Rather, appellate counsel, after reviewing the Court's thorough and careful record, reasonably could have concluded that there were no other more obvious claims (and Graziano identifies none in his 2255 petition).  The claims raised, at the very least, were material.

POINT IV

COUNSEL'S DECISION NOT TO
CALL AN EXPERT TO TESTIFY
ON THE RECOVERABILITY OF
VIDEO FOOTAGE FROM THE GRAHAMS'
SURVEILLANCE SYSTEM DID NOT
CONSTITUTE INEFFECTIVE ASSISTANCE

Graziano, in what he calls a "Supplemental Argument,"
claims that counsel should have called "an expert in computer
forensics ... to testify on the issue of recoverability, to
disprove the '48-hour' loop theory" (Br. 46) – an apparent
reference to testimony by Nassau County Police Department Arson
Bomb Squad Detective James Turner that he recovered only 47 hours
of footage from the Grahams' surveillance system.  The inference,
although Graziano does not argue this explicitly, is that
counsel's failure to do so constituted ineffective assistance.
Graziano's claim has no merit.

As an initial matter, the evidence for his argument is
simply a collection of unsworn assertions from unknown sources
buttressed by several irrelevant newspaper articles.  Graziano
produces no affidavits from nor even supplies any credentials for
any of the purported experts he (or a family member) consulted.
Moreover, his assertions are not even supported by the electronic
mail exchanges with the purported experts which he _does_ enclose
with his brief – rather, the experts respond that they would have
to examine the unit in question before drawing any conclusions.
(Br. 51-53).  Thus, it is not evident where Graziano is drawing

-61-

support for the assertions he makes in the first three paragraphs of his Supplemental Argument about the Grahams' recording equipment.

Equally unavailing is Graziano's assertion that Detective Turner's testimony was unreliable because of problems with the Nassau County Police Department's crime laboratory. This is wholly irrelevant. Detective Turner, whom the Court deemed an expert, testified that he worked in the computer crimes section of the department, not the crime laboratory. (T 120). He testified that the Grahams' hard drive was retained by the computer crimes squad, not the crime laboratory. (T 123). There is simply no evidence in the record, and Graziano supplies none, to suggest that the crime laboratory was ever involved in analyzing the Grahams' hard drive. Both of the articles about the crime laboratory which Graziano encloses with his brief (Br. 47-49) discuss problems with drug testing and mention nothing about computers. In sum, Detective Turner's status as an expert, and his conclusions about the amount of remaining footage following his examination of the Grahams' hard drive, neither of which the defense challenged, are clear in the record and nothing presented by Graziano in his Supplemental Argument dispels that.

But even assuming the argument's validity, arguendo, counsel – which vigorously exploited the government's lack of video footage corroborating Morrow's account of the days before the arson (T 870-71) – stood little to gain by actually trying to

-62-

obtain such footage.  It might well have cut against them.
Graziano's presumptive defense, after all, highlighted in the
defense opening, was that he <u>did</u> meet with Morrow and he <u>did</u>
order an attack on Roseanne's.  Counsel, whose job was not to
prove Graziano innocent, but to obtain a not guilty verdict, may
have assumed that there <u>would</u> be footage of Graziano meeting with
Morrow more than two days before the fire (had the system
retained it), and thus made a strategic choice that they were
better off emphasizing the <u>lack</u> of such footage in evidence,
contributing to a strong reasonable doubt defense which would not
require Graziano's testimony.  See, <u>e.g.</u>, <u>United States v.
Tarricone</u>, 21 F.3d 474, 476 (2d Cir. 1993) (failure to call
handwriting expert not ineffective assistance because counsel
could have decided that the jury could draw the desired
conclusions without the aid of an expert).

Counsel's decision not to dispute Detective Turner's
testimony, much less to call an expert to rebut it, was
objectively reasonable.  There is no evidence in the record (or
supplied now by Graziano) that the testimony was unreliable.
Moreover, even if there were such evidence, counsel could
reasonably have decided that highlighting the lack of footage was
the most effective way to exploit it.

-63-

<u>POINT V</u>

THE COURT
SHOULD DENY GRAZIANO'S
<u>PETITION WITHOUT A HEARING</u>

Because Graziano's "motion and the files and records of the case conclusively show that [Graziano] is entitled to no relief," 28 U.S.C. § 2255(b), the Court should deny his petition without a hearing. Graziano fails to present a prima facie claim of ineffective assistance of counsel, the sole ground for his petition, and therefore no material facts are in dispute to be resolved at a hearing.

The Second Circuit has likened the procedure for determining whether a § 2255(b) evidentiary hearing is required to that for a summary judgment proceeding:

> The procedure for determining whether a hearing is necessary is in part analogous to, but in part different from, a summary judgment proceeding. The petitioner's motion sets forth his or her legal and factual claims, accompanied by relevant exhibits: e.g., an affidavit from the petitioner or others asserting relevant facts within their personal knowledge and/or identifying other sources of relevant evidence. [Citations omitted.] The district court reviews those materials and relevant portions of the record in the underlying criminal proceeding. [Citations omitted.] The court then determines whether, viewing the evidentiary proffers, where credible, and record in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a <u>prima facie</u> case for relief. If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made.

-64-

Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009).  See, e.g., United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987) (holding that hearing is appropriate when application includes "assertions of fact that a petitioner is in a position to establish by competent evidence"); Newfield v. United States, 565 F.2d 203, 207 (2d Cir. 1977) (a motion supported by a "sufficient" affidavit including detailed and controverted issues of fact warrants a hearing, but "bald allegations" unsupported by evidentiary facts do not).

That said, the Court need not, as in a summary judgment proceeding, accept the petitioner's assertions as true when they are contradicted by the record.  Puglisi, 586 F.3d at 214.  This is especially true when the judge that tried the underlying proceedings also presides over the § 2255 motion.  Id.  In this instance, an evidentiary hearing often is unnecessary because the "trial judge is intimately familiar with the proceedings and the surrounding circumstances."  Id. at 215.

Here, Graziano raises no claims based on facts outside the record, and thus there is no reason to expand the record by holding an evidentiary hearing.  With respect to his first three claims, concerning aiding and abetting, Rule 33 and Rule 29, his contentions of ineffective assistance are simply contradicted by well-settled law.  Put simply, these are all losing and/or frivolous arguments, based wholly on the existing record, and thus counsel provided effective assistance by not raising them.

Graziano's fourth claim, concerning the missing video footage, fails for a somewhat different reason – it consists of "bald allegations," and critically, identifies no "sources of relevant evidence" outside the record.  <u>Id</u>. at 213.  Even assuming Graziano had asserted stronger factual claims, however, he does not demonstrate, nor even argue, for that matter, that it was ineffective assistance for counsel not to call a computer forensics expert.

The government urges the Court to deny Graziano's petition without hearing because his claims, based wholly on the existing record, do not present a "plausible" claim of ineffective assistance of counsel.  <u>Armienti v. United States</u>, 234 F.3d 820, 823 (2d Cir. 2000).

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the Court deny the petitioner's motion.

Dated: Washington, D.C.
       March 23, 2012

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney


                         By:   /S/ Evan C. Williams
                              Evan C. Williams
                              U.S. Department of Justice
                              Trial Attorney
                              (202) 307-0135

cc:  Clerk of the Court (JFB)
     Carmine Graziano

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the government's attached MEMORANDUM OF LAW to be served this day by mail on:

        Carmine Graziano
        Fed. Reg. #72028-053
        Low Security Correctional Institution
        P.O. Box 999 (Durham)
        Butner, North Carolina 27509


                        /S/ Evan C. Williams
                        Evan C. Williams
                        U.S. Department of Justice
                        Trial Attorney
                        (202) 307-0135


Dated: Washington, D.C.
       March 23, 2012